UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

VICKIE WRIGHT,                          )
                                        )
              Plaintiff,                )
                                        )
       vs.                              )          Case No. 4:21 CV 792 ACL
                                        )
KILOLO KIJAKAZI,                        )
Acting Commissioner of Social Security  )
Administration,                         )
                                        )
              Defendant.                )

**<u>MEMORANDUM</u>**

Plaintiff Vickie Wright brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial

review of the Social Security Administration Commissioner's denial of her applications for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental

Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Wright's severe impairments,

she was not disabled as she had the residual functional capacity ("RFC") to perform work

existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with

consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is

presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

**I.   Procedural History**

This case has a lengthy procedural history.   Wright filed her applications for benefits on

May 23, 2013.[1]   (Tr. 260-72.)   She claimed she became unable to work on October 31, 2011, due to obsessive compulsive disorder ("OCD"), anxiety, and "nerves."   (Tr. 305.)   Wright was 58 years of age at her alleged onset of disability date.   After her application was denied initially, she appealed to an ALJ.   (Tr. 173-86.)   On November 19, 2015, an ALJ issued a decision finding Wright was not disabled.   (Tr. 155-65.)   On October 14, 2016, the Appeals Council remanded the case to the ALJ, finding that Wright's response to the proffer of the post-hearing evidence was not adequately addressed.   (Tr. 171.)   The Appeals Council directed the ALJ to offer Wright an opportunity for a supplemental hearing, pursuant to her request for such.   *Id.*

On November 2, 2017, an ALJ issued another decision, following a hearing, finding Wright was not disabled.   (Tr. 11-23.)   On May 2, 2018, the Appeals Council denied Wright's request for review.   (Tr. 1-5.)   Wright appealed that decision to this Court.   (Tr. 605-10.)   The Commissioner requested that this Court remand the case and offer Wright another opportunity for a supplemental hearing.   (Tr. 612.)   The undersigned granted the Commissioner's request on February 28, 2019.   (Tr. 612-13.)

On May 7, 2019, the Appeals Council remanded the case to an ALJ, indicating that the ALJ erred in not granting Wright a supplemental hearing on post-hearing consultative reports. (Tr. 616.)   On May 3, 2021, after a subsequent hearing, an ALJ found that Wright was not disabled.   (Tr. 460-77.)   Wright filed a request for review of the ALJ's decision with the Appeals Council on May 17, 2021, which was denied.[2]   (Doc. 9 at 5-6.)   Thus, the May 3, 2021

---

[1]Wright previously received disability benefits beginning August 16, 1988.   (Tr. 124-33.) Upon a Continuing Disability Review, it was found Wright's disability ceased on February 15, 1997, due to medical improvement.   *Id.*

[2]The Appeals Council's denial of Wright's request for review is not contained in the record.   *See* Doc. 12.

decision of the ALJ stands as the final decision of the Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Wright, proceeding *pro se*, first argues that the ALJ erred in that Wright was not "represented by counsel/attorney, while under stress suffering severe anxiety, representing self."  (Doc. 30 at 4.)   She next argues that the ALJ erred in failing to "consider all evidence and complaints of Plaintiff/Claimant's or issues that causes Plaintiff/Claimant's disability, causing the inability to work."  *Id.*   Finally, Wright argues that the ALJ erred "due to the fact all evidence was not weighed, considered, and entered into as evidence and some evidence was misconstrued and discriminatory."  *Id.* at 5.

## II.   The ALJ's Determination

The ALJ first found that Wright met the insured status requirements of the Social Security Act through December 31, 2016.[3]  (Tr. 463.)   She stated that Wright has not engaged in substantial gainful activity since October 31, 2011, her alleged onset of disability date.   *Id.* In addition, the ALJ concluded that Wright had the following severe impairments: degenerative disc disease of the lumbar spine, obesity, anxiety, and OCD.   *Id.*   The ALJ found that Wright did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.   (Tr. 464.)

As to Wright's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to

---

[3]Wright must establish a disability prior to the expiration of her insured status to be entitled to DIB.   *See* 20 C.F.R. §§ 404.101, 404.130-131.   For purposes of Title XVI, Wright must demonstrate that she was disabled during the time her application was pending.   *See* 20 C.F.R. §§ 416.330, 416.335.   Thus, the relevant period for Wright to prove disability for Title II purposes was October 31, 2011 through December 31, 2016; and the relevant period for Title XVI benefits was June 1, 2013 to May 3, 2021.

> perform medium work as defined in 20 CFR 404.1567(c) and
> 416.967(c) except: she is limited to no direct interaction with the
> public, casual and infrequent interaction with co-workers, and
> occasional interaction with supervisors.

(Tr. 467.)

The ALJ found that Wright was unable to perform her past relevant work as a home health aide, but was capable of performing other jobs existing in significant numbers in the national economy.   (Tr. 475.)   The ALJ therefore concluded that Wright was not under a disability, as defined in the Social Security Act, from October 31, 2011, through the date of the decision.   (Tr. 476.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability
> insurance benefits filed on May 23, 2013, the claimant is not
> disabled under sections 216(i) and 223(d) of the Social Security
> Act.
>
> Based on the application for supplemental security income filed on
> May 23, 2013, the claimant is not disabled under section
> 1614(a)(3)(A) of the Social Security Act.

(Tr. 477.)

## III.   Applicable Law

### III.A.   Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This

"substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v.*

*Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).   Put another way, a court should "disturb the ALJ's decision only if it falls outside the available zone of choice."   *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (citation omitted).

### III.B.  Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner

looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003).   "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b).   These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).   "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.   If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.   20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements"

of the claimant's past relevant work.   20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).   "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations."   *Wright v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3).   The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id*.   If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.   *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience.   *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000).   The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.   *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v).   If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.   If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled.   20 C.F.R. § 416.920(a)(4)(v).   At Step Five, even though

the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant.   *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.   *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).   If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."   20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).   The Commissioner must then rate the degree of functional loss resulting from the impairments.   *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3).   Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.   *See id.*   Next, the Commissioner must determine the severity of the impairment based on those ratings.   *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c).   If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.   *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.   *See id.*   If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment.   *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV.   Discussion

As previously noted, Wright raises three claims.   The undersigned will discuss her claims in turn.

1.  **Wright's Lack of Representation**

Wright first argues that she was unrepresented by counsel during the administrative hearing and was "under stress" and "suffering severe anxiety."   (Doc. 30 at 4.)

Disability claims under the Social Security Act are non-adversarial, and the ALJ has a well-recognized duty to develop the record.   *See Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014).   Accordingly, if the claimant is without counsel, the ALJ must ask probing questions of the claimant to ensure the record is well-developed.   *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000).   "[T]he ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record."   *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994).

In advance of her October 2020 hearing—her sixth hearing in this matter—the ALJ provided Wright with a Notice of Hearing that informed Wright of her right to representation in the body of the letter.   (Tr. 749-53.)   The ALJ also included a two-page handout that described, in detail, her right to representation.   (Tr. 754-55.)   At the beginning of the hearing, the ALJ addressed Wright's rights to obtain representation as follows:

> [Y]ou have the right because you're not represented, I have to give you your right to representation as well.   So, you have the right to be represented by an attorney or non-attorney.
> A representative can help you obtain information about your claim, submit evidence, medical terms, how [to] protect your rights and make any requests or give any notes about the proceedings before me.   A representative may not charge a fee or receive a fee unless we approve.
> But they can charge you what they call costs, costs to make copies, costs to get medical records.   Anything that's not a fee is a cost, and they can charge you whatever.   We don't get involved in that.   You also have the right to proceed without a representative.
> And if you do that I will obtain the relevant medical and nonmedical records and question you at the hearing.   Nevertheless, a representative can present your evidence in a way that is most favorable to your case.   So, do you understand your right to representation?

(Tr. 502.)   Wright responded: "Yes.   I do."   (Tr. 503.)   The ALJ then stated: "And do you wish to proceed today without a representative or would you like a one-time postponement to get a representative?"   *Id.*   Wright stated: "I just want to go and pursue…to make it without representation."   *Id.*

The ALJ also sufficiently questioned Wright in order to develop the record.   Wright had repeated opportunities to present the agency with her subjective complaints regarding her allegedly disabling limitations.   The State agency developed the record by sending plaintiff forms that inquired about her medical conditions, and by sending her to multiple consultative examinations.

The record reveals that the ALJ adequately advised Wright of her right to representation and that Wright waived that right at the hearing.   Thus, Wright's lack of representation does not serve as a basis to reverse or remand the Commissioner's decision.

### 2.   ALJ's Evaluation of the Evidence

Wright next argues that the ALJ erred in failing to consider all of the evidence and all of Wright's complaints that support her inability to work.   The undersigned construes Wright's claim as challenging the ALJ's evaluation of Wright's subjective complaints, the ALJ's evaluation of the medical opinion evidence, and the ALJ's RFC determination.

### A.   Subjective Complaints

When determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints.[4]   *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez*

---

[4]Social Security Ruling 16-3p eliminated the term "credibility" from the analysis of subjective complaints.   However, the regulations remain unchanged; "Our regulations on evaluating symptoms are unchanged."   SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529, 416.929.

*v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).   In doing so, the ALJ must consider the claimant's prior work record and third-party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions.   *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).   The ALJ is not mechanically obligated to discuss each of the above factors, however, when rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing his or her reasons for discrediting the testimony, and the ALJ's credibility assessment must be based on substantial evidence.   *Vick v. Saul*, No. 1:19 CV 232 CDP, 2021 WL 663105, at *8 (E.D. Mo. Feb. 19, 2021) (citing *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Grba-Craghead v. Astrue*, 669 F. Supp. 2d 991, 1008 (E.D. Mo. 2009)).   On review by the court, "[c]redibility determinations are the province of the ALJ." *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) (quoting *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016)).   The court defers to the ALJ's determinations "as long as good reasons and substantial evidence support the ALJ's evaluation of credibility."   *Id.*

The ALJ summarized Wright's testimony regarding her limitations as follows, in relevant part:

> The claimant testified that she went to the emergency room in 2019 after a fall.   She reported no other medical care outside of the consultative examination. She stated that there were things 'falsely written' in the prior decision and stated she was 'discriminated against.'   She said she had not received any other medical care and did not have the money for care.   The claimant testified that she had been disabled since 2011 mainly due to stress.   She said she could not handle the stress anymore.   She said she was harassed at work and disrespected until the 'mental anguish was just too much.'   She said she could not work under those conditions anymore.   She stated that people shined lights in her house and played 'mental games.'   She stated something in her back made a crackling sound and she had pain when sitting.   She also alleged spasms in her knees and behind that limited her sitting or standing for long periods.   She said she was 'not going back

to work.'   She stated she had quit using the crutch because she did 'not want to
be dependent on it.'

(Tr. 468.)

The ALJ determined that, although Wright's medically determinable impairments could
reasonably be expected to cause some of the alleged symptoms, her statements regarding the
intensity, persistence, and limiting effects of these symptoms were not entirely consistent with
the medical evidence and other evidence in the record.   *Id.*   The Court finds that the ALJ
appropriately considered Wright's subjective allegations.

The ALJ first discussed the medical evidence.   She stated that "the limited medical
evidence of record does not support [Wright's] alleged limitations due to her medical
conditions."   *Id.*   The ALJ indicated that the medical evidence does not show any impairments
to the knees, nor does it support an inability to sit or stand for long periods due to her prior fall,
knee spasms, or back pain.   *Id.*   She continued that there was no objective medical evidence
that supports an inability to handle stress due to her mental health impairments.   (Tr. 468-69.)
The ALJ stated that, while Wright "may have experienced stress, harassment, or other issues in
her past employment situations, the medical evidence does not contain objective findings to
show that her mental health impairments caused disabling limitations in her functioning."   (Tr.
469.)

A summary of the medical evidence cited by the ALJ is provided below:

Wright saw Aqeeb Ahmad, M.D. on July 29, 2013, for a psychiatric evaluation at the
request of the state agency.   (Tr. 469, 397.)   Wright complained of OCD, and described her
compulsive behavior as mostly staring at other people.   (Tr. 397.)   She stated that she stares at
them in an inappropriate fashion, "looking at their chest or below their chest."   *Id.*   Wright
indicated that this upsets people, and they then "play games with her," although nobody has

confronted her with this behavior.   *Id.*   She feels that other people are making fun of her because of her illness, and can sometimes hear people whispering things about her.   *Id.*   Wright indicated that this happens more when she is under stress and is nervous.   *Id.*   She also reported that she is obsessed with doing things in certain order.   (Tr. 398.)   She claimed that she was not treated well at her last job as a certified nurse's assistant.   *Id.*   Wright reported that she does not socialize and has no friends.   *Id.*   She has an eleventh-grade education and a GED.   (Tr. 399.) Upon examination, Wright's flow of speech was fairly normal, but it was tangential and there was poverty of content; her mood appeared to be anxious; her affect was appropriate; she denied suicidal or homicidal thoughts; she may be having auditory hallucinations that she is hearing people whisper about her, or it may have actually happened; she appeared to be of average intelligence; and she showed marginal insight into the problem.   *Id.*   Dr. Ahmad did not observe any staring spells.   *Id.*   He diagnosed Wright with OCD, and rule out underlying psychotic disorder.   *Id.*   Dr. Ahmad noted that Wright has never received any formal treatment, other than perhaps a few sessions of psychotherapy; and no medications have ever been prescribed.   *Id.*   He stated that she "probably will not be able to hold the job at this time," although she was capable of managing her funds.   *Id.*

In August 2014, Wright received emergency care for a rash to her arms and legs likely due to exposure to poison oak or poison ivy.   (Tr. 469, 403.)   Wright reported that she had not seen a doctor "in a while," and that she gets nervous in hospitals.   *Id.*

Wright was next seen on April 30, 2015, for a psychological evaluation with Michael T. Armour, Ph.D.   (Tr. 469, 424.)   Wright indicated that she experienced difficulty reading as a child, but she was able to read "pretty good now."   (Tr. 425.)   She indicated that she had no difficulty reading or understanding the average newspaper story or the Disability Determinations

appointment letter.  *Id.*  She had received vocational training as a secretary, school bus driver, and a machine shop operator, and had completed paralegal coursework.  *Id.*  Wright reported that she was not receiving any psychological or psychiatric treatment.  (Tr. 426.)  She reported that she was nervous about her OCD, which she had "as a kid."  *Id.*  She described a desire to keep things in order, and reported that she had a "staring problem" involving staring at "people's private parts daily."  *Id.*  Wright's brother lived with her in her home, and she indicated she can cook, clean "sometimes," do laundry, and manage her money "ok."  *Id.*  When asked why she was unable to work, Wright responded "harassment, teasing, and games over the years," and that she "can't take it anymore."  *Id.*  Wright drove herself to the evaluation.  *Id.*  She "frequently moaned and complained to herself when a new task or subtest was introduced to her," but was otherwise cooperative.  (Tr. 426-27.)  Dr. Armour administered intelligence testing, which revealed a Full-Scale IQ in the borderline range.  (Tr. 428.)  Dr. Armour stated that this appears to be a "mild underestimation" of her current level of cognitive functioning.  *Id.*  On mental status examination, Wright was alert and oriented, her speech was normal, her responses were simple but relevant and logical, her mood varied from subdued to flustered when asked to solve tasks, her affect varied from not much emotional expression to flustered, her emotion was appropriate to the subject, she did not display inappropriate affect, her intellect was estimated as within the low average to average range of intellectual functioning, her long-term memory was intact, her immediate memory was in the low average to average range, and her insight and judgment were adequate.  (Tr. 428-29.)  Dr. Armour diagnosed Wright with major depressive disorder, recurrent, moderate; OCD; and panic disorder by history.  (Tr. 429.)  He expressed the opinion that Wright had mild to occasionally moderate impairment in her ability to understand and recall instructions; at least moderate impairment in her ability to sustain concentration and

persistence in tasks; and moderate impairment in her ability to interact socially and adapt to her environment.   (Tr. 430.)

Wright presented for a psychological consultative examination with Ann Levine, Psy.D, on May 10, 2017.   (Tr. 470, 451.)   Wright described her symptoms of anxiety and OCD as "staring at genitals," and then being anxious that people are watching her to see if she will stare. (Tr. 451-52.)   She reported that she stays at home to avoid stress.   (Tr. 452.)   Wright believed that she had been slandered and discriminated against in her previous jobs.   (Tr. 452.)   Upon mental status examination, Wright was alert, adequately groomed, answered the examiner's questions, made eye contact, was cooperative, reported that she had cried in the waiting room because she was overwhelmed, her affect was neutral, she demonstrated limited tangential thinking and preoccupations, had no difficulty with memory or simple calculations, her ability to discuss similarities and differences was fair, and her insight and judgment were limited.   (Tr. 453-54.)   Dr. Levine diagnosed Wright with "unspecified schizophrenia spectrum and other psychotic disorder."   (Tr. 455.)   She found that Wright had mild impairment in her ability to understand, remember, or apply information; moderate impairment in her ability to interact with others; mild impairment in her ability to concentrate, persist, or maintain pace; and mild impairment in her ability to adapt or manger herself.   (Tr. 454.)

Wright presented to Alan H. Morris, M.D., for an orthopedic evaluation on May 10, 2017.   (Tr. 471, 442.)   She complained of low back pain since a work-related injury in 1989. (Tr. 442.)   Wright indicated that she had not received treatment for her back after that time.   *Id.* She was involved in a motor vehicle accident in October 2016, after which she experienced low back pain.   *Id.*   She described a "clicking" in her low back, and lumbar spine pain with no radiation.   *Id.*   The pain is worse when she sits or bends.   *Id.*   Wright reported that she was

told she had high blood pressure during a 2009 emergency room visit for poison ivy, but she has

not sought treatment for this.   *Id.*   She stated that she can sit for two hours, stand for two hours,

walk for two hours, but could only lift three to four pounds.   (Tr. 443.)   Wright lived with her

brother and was able to dress herself, bathe, make her bed, wash dishes, drive, shop for groceries,

and cook.   *Id.*   Dr. Morris noted that Wright's reliability was "reasonable," although Wright

was unable to explain why she has never seen any medical providers for her complaints of low

back pain nor for her elevated blood pressure.   *Id.*   On examination, she was able to walk fifty

feet unassisted, her gait was normal, she had no spine deformity, she was able to toe and heel

walk, she was able to squat to forty degrees bilateral knee flexion, she could rise from a chair and

get on and off the examining table independently without evidence of pain, and she was able to

cross one leg over the other to put on her shoes.   *Id.*   Wright had slightly reduced lumbar spine

range of motion, and low back pain with supine straight leg raising.   (Tr. 443.)   X-rays of the

lumbar spine revealed facet arthrosis with degenerative grade 1 anterior listhesis L4 on 5.[5]   (Tr.

444.)   Dr. Morris diagnosed Wright with low back pain with lumbar arthrosis, primarily L4-5.

*Id.*

        Wright was seen in the emergency room on August 29, 2018, after being involved in a

motor vehicle crash the previous day.   (Tr. 471, 933.)   She was wearing a cervical collar and

complained of back and right-sided neck pain.   (Tr. 936.)   Wright had not taken any over-the-

counter medications at home.   *Id.*   X-rays were negative.   (Tr. 939.)   She was diagnosed with

cervical strain and was discharged with instructions to follow-up with a physician for her

---

[5]Anterolisthesis is a spine condition in which the upper vertebral body slips forward onto the
vertebra below.   The amount of slippage is graded on a scale from 1 to 4.   Grade 1 is mild (less
than 25% slippage), while grade 4 is severe (greater than 75% slippage).   *See* Spine-Health,
https://www.spine-health.com/glossary/anterolisthesis (last visited September 22, 2022).

untreated hypertension.   *Id.*

On December 9, 2019, Wright presented to the emergency room for evaluation of right leg pain after sustaining a fall a week earlier.   (Tr. 472, 895.)   Wright reported that she was pushing furniture out to the curb when she slipped and fell forward, striking her face on the furniture.   *Id.*   She complained of pain in her right buttock and inner thigh that is worse with sitting or lying down.   *Id.*   X-rays of the pelvis revealed no fractures.   (T. 898.)   Wright was diagnosed with right lower extremity pain and severe hypertension.   (Tr. 899-900.)   She was instructed to use crutches.   (Tr. 913.)

On January 7, 2020, Wright underwent a consultative internal medicine examination with Veronica Weston, M.D.   (Tr. 472, 841.)   Wright reported that she was injured on November 28, 2019, when she was pushing furniture out of the store while shopping on Black Friday.   (Tr. 841.)   She complained of continued pain in the right thigh, with soreness along the anterior thigh; and pain in the gluteal region.   *Id.*   Wright stated that she has difficulty sitting for prolonged periods of time and sitting on hard objects, and noted that she tends to sit in chairs leaning to the left side so she can relieve pressure.   *Id.*   Wright also complained of pain in the middle of the lower lumbar spine, which was worse with certain positional changes and with testing.   (Tr. 842.)   She was currently using a crutch, which was prescribed due to her right thigh injury in November 2019.   *Id.*   Wright reported that she can walk about one to two blocks with the crutch; she can stand up to thirty minutes with pain; and she experiences pain with bending and squatting.   *Id.*   Wright had been told multiple times during emergency room visits that her blood pressure is elevated but she was not taking medication for this condition.   *Id.*   She noted that she was under a lot of stress and had high anxiety due to being harassed by neighbors and family.   *Id.*   Wright lived with her brother and does cooking, cleaning, laundry,

shopping, showering, and dressing herself.  (Tr. 843.)  She likes to watch television, engage in online social media activities, and play video games.  *Id.*  Upon examination, Wright was found to be obese, in no acute distress, and appeared to be uncomfortable.  *Id.*  Her gait was right antalgic, due to her recent right lower extremity injury.  (Tr. 845.)  Dr. Weston noted some decreased strength in the right lower extremity, some tenderness to palpation along the lower lumbar spine and the right thigh and gluteal muscles, and slightly decreased range of motion of the lumbar spine.  *Id.*  Wright did not fully weight bear on the right lower extremity.  *Id.*  Her straight leg raising was negative seated and supine, and no lower extremity sensory deficits were found.  *Id.*  Dr. Weston diagnosed Wright with right lower extremity muscle strain status post injury in November 2019; hypertension; and lumbago.  *Id.*

The medical evidence of record does not support the presence of a disabling physical or mental impairment.  As the ALJ noted, examinations noted some lumbar tenderness, occasional pain with straight leg raising test, and some reduced range of motion of the lumbar spine.  (Tr. 474.)  Other than the brief muscle strain to the right lower extremity following Wright's fall, there was no evidence of impaired gait, reduced strength, reduced sensation, or any limitation in the movement of the extremities.  *Id.*  With regard to Wright's mental impairments, the ALJ noted that Wright reported anxiety related to her compulsive staring behavior, yet no treatment provider documented Wright staring inappropriately or otherwise behaving inappropriately in examinations.  *Id.*  On mental status examinations, no deficits were found in Wright's cooperation, eye contact, communication abilities, or interaction with treatment providers.  *Id.*  Wright only occasionally was noted to have an anxious mood, with no evidence of lability, tearfulness, witnessed panic attacks, or difficulties controlling her emotions.  (Tr. 473.)

The ALJ must consider the absence of objective medical evidence supporting a plaintiff's

subjective complaints, although the ALJ may not discount a plaintiff's subjective complaints solely because they are unsupported by objective medical evidence. *Grindley v. Kijakazi*, 9 F.4th 622, 630 (8th Cir. 2021) ("[A]n ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary") (internal citation omitted). *See also Goff v. Barnhart*, 421 F.3d 785, 792-93 (8th Cir. 2005) (ALJ properly considered unremarkable or mild objective findings as one factor in assessing subjective complaints.).  The ALJ properly considered the lack of objective medical evidence supporting Wright's subjective complaints.

Significantly, the ALJ pointed out that Wright has received minimal medical treatment since her alleged onset of disability of October 31, 2011, and there is no evidence of medical treatment received prior to July 29, 2013.  (Tr. 469.)   A claimant's "failure to seek treatment" is not dispositive, though it certainly "may indicate the relative seriousness of a medical problem." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995); *see also Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (finding conservative treatment weighs against credibility); *Vanlue v. Astrue*, 4:11-cv-595-TIA, 2012 WL 4464797, at *12 (E.D. Mo. Sept. 26, 2012) (finding minimal and conservative mental health treatment weigh against a finding of disability).

All of the medical evidence in the record is either from consultative examinations ordered by the state agency, or emergency room visits for various acute impairments.   Consultative examiner Dr. Morris remarked that Wright was unable to explain why she has never seen any medical providers for her complaints of low back pain nor for her elevated blood pressure, in discussing Wright's "reliability."    (Tr. 443.)   The ALJ acknowledged Wright's statement that she had financial obstacles to obtaining treatment, but noted that Wright was provided with information on various clinics with no indication she attempted to obtain free or affordable

healthcare.   (Tr. 474.)   *See Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2003) (plaintiff is not excused for failure to pursue treatment where there is no evidence plaintiff was ever denied treatment because of insufficient funds or insurance).

The ALJ also discussed Wright's daily activities.   She noted that Wright was able to complete household chores, cook, play computer games, drive, shop for groceries, and take care of her brother.   (Tr. 474, 323-26.)   Of note, Wright reported that she was injured in November 2019, when she was moving furniture while shopping on Black Friday.   (Tr. 841.)   Although a claimant's ability to perform such activities "does not disprove disability as a matter of law," *Casey*, 503 F.3d at 696, it was appropriate for the ALJ to consider such inconsistencies when evaluating Wright's subjective complaints.   *See, e.g., McDade v. Astrue*, 720 F.3d 994, 998 (8th Cir. 2013) (noting the claimant's ability to "perform some cooking, take care of his dogs, use a computer, drive with a neck brace, and shop for groceries with ... an electric cart"); *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2010) (stating "acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain").

In light of these considerations, the Court finds that the ALJ did not err in discounting Wright's subjective complaints.   The ALJ explicitly found that Wright's complaints were not entirely consistent with the medical and other evidence in the record, she identified good reasons for discounting the complaints, and her determination is supported by substantial evidence on the record as a whole.

### B.  Opinion Evidence and RFC

A claimant's RFC is the most she can do despite her physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).   It is the ALJ's responsibility to

determine a claimant's RFC by evaluating all medical and non-medical evidence of record.   20

C.F.R. §§ 404.1545, 404.1546, 416.945, 416.946.   Some medical evidence must support the

ALJ's RFC finding, but there is no requirement that the evidence take the form of a specific

medical opinion from a claimant's physician.   *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir.

2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012); *Martise v. Astrue*, 641 F.3d 909,

927 (8th Cir. 2011).   "The determination of a claimant's RFC during an administrative hearing

is the ALJ's sole responsibility and is distinct from a medical source's opinion."   *Wallenbrock v.*

*Saul*, No. 4:20-CV-00182-SRC, 2021 WL 1143908, at *6 (E.D. Mo. Mar. 25, 2021) (citing

*Kamann v. Colvin*, 721 F.3d 945, 950-51 (8th Cir. 2013)).

The ALJ found that Wright had the RFC to perform medium work, except she was

limited to no direct interaction with the public, only casual and infrequent interaction with co-

workers, and only occasional interaction with supervisors.   (Tr. 467.)

In determining Wright's RFC, the ALJ considered the medical opinion evidence.

Medical opinions are statements from acceptable medical sources that reflect judgments about

the nature and severity of a claimant's impairment(s), including her symptoms, diagnoses, and

prognoses; what she can still do despite her impairments; and her physical and mental

restrictions.[6]   20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1) (2017).   The Regulations require that

more weight be given to the opinions of treating sources than other sources.   20 C.F.R. §§

404.1527(c)(2), 416.927(c)(2).   A treating source's assessment of the nature and severity of a

claimant's impairments should be given controlling weight if the opinion is well supported by

---

[6]In March 2017, the Social Security Administration amended its regulations governing the
evaluation of medical evidence.   For evaluation of medical opinion evidence, the new rules
apply to claims filed on or after March 27, 2017.   *See* 20 C.F.R. §§ 404.1520c, 416.920c.
Because the claims under review here were filed before March 27, 2017, the Court will apply the
rules set out in 20 C.F.R. §§ 404.1527 and 416.927.

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004).

The ALJ first discussed the prior administrative medical finding of Marsha Toll, Psy.D. (Tr. 473.)   On August 8, 2013, Dr. Toll expressed the opinion that Wright had mild restrictions in activities of daily living, mild difficulties maintaining social functioning, and mild difficulties maintaining concentration, persistence, and pace.   (Tr. 146.) The ALJ assigned "little weight" to Dr. Toll's opinion, finding that the medical evidence supports more than mild limitations in her social functioning, given Wright's anxiety and discomfort around others and her reported issues with staring at others in an inappropriate way.   (Tr. 473.)

The ALJ stated that Dr. Ahmad's opinion after his 2013 consultative examination that Wright would "probably" not be able to hold a job at that time was given little weight.   (Tr. 474, 399.)   She noted that Dr. Ahmad offered no explanation for his opinion based on the objective medical findings, his statement expressed his own uncertainty with his use of "probably," and Dr. Ahmad did not offer opinions regarding actual functional limitations impacting Wright's ability to perform work-related activities.   (Tr. 474.)

Next, the ALJ indicated that she was assigning "some weight" to the opinions Dr. Armour offered after his 2015 consultative examination.   (Tr. 473.)   Dr. Armour found Wright had a "mild to occasionally moderate" impairment in her ability to understand and recall information.   (Tr. 430.)   The ALJ indicated that the intellectual testing conducted by Dr. Armour supports some mild limitations in her intellectual functioning and working memory, although her educational background and daily functioning support greater functioning than suggested by the testing.   (Tr. 473.)   She stated that the overall evidence supports moderate

limitations in interacting with others, as Dr. Amour indicated, due to Wright's social anxiety and issues with appropriate interactions with others.   *Id.*   Finally, the ALJ found that the evidence does not support moderate limitations in sustaining concentration, persistence, and pace, as found by Dr. Armour.   *Id.*   She explained that Wright was able to complete the testing without significant difficulties, although she complained about the tasks presented; and there was no evidence of distractibility, fidgeting, restlessness, or a need for redirection in Dr. Armour's examination or in the reminder of the medical record.   *Id.*

The ALJ then discussed Dr. Levine's findings following her May 2017 psychological consultative examination.   (Tr. 473.)   Dr. Levine found that Wright had a mild impairment in understanding, remembering, and applying information; a mild limitation in concentrating, persisting, and maintaining pace; a mild limitation in adapting and managing herself; and a moderate impairment in interacting with others.   (Tr. 454.)   The ALJ found that Dr. Levine's opinions as to Wright's functional limitations were consistent with the record as a whole, and thus assigned them "great weight."   (Tr. 473.)   The ALJ, however, noted that Dr. Levine's diagnosis of "unspecified schizophrenia spectrum and other psychotic disorder" was inconsistent with the other examiners' diagnoses.   *Id.*

The ALJ concluded that Wright retained the physical RFC to perform medium work. (Tr. 474.)   She explained that the medical evidence does not support an inability to perform work at the medium exertional level, given the generally normal musculoskeletal examinations and her ability to carry out activities of daily living.   *Id.*   With regard to Wright's mental RFC, the ALJ concluded that Wright's primary complaints, other than her staring concerns and social anxieties, related to her repeated complaints of harassment, unfair or discriminatory treatment, and being unable to handle the reported stressors of her past working environments.   (Tr. 475.)

The ALJ stated that the medical evidence contains no objective findings to support an inability to handle stress in the general workplace.  *Id.*   To the contrary, the ALJ noted that Wright has been able to care for her disabled brother, handle her finances, and mange her activities of daily living despite her mental health impairments.  *Id.*   The ALJ stated that "it is certainly unfortunate that [Wright] has experienced unfairness or other difficulties in her past work environments," however, "the residual functional capacity must be supported by the medical evidence of record."  *Id.*   The ALJ added that Wright's "personal feelings about the fairness of her past work situations and her desire to return to work, or lack thereof, are of little significance when determining the residual functional capacity unless those concerns are supported by the objective medical evidence."  *Id.*   The ALJ found that the medical evidence supports some moderate limitations in social functioning, but it does not support a complete inability to perform work-related activities.  *Id.*

The undersigned finds that the ALJ's RFC determination is supported by substantial evidence on the record as a whole.   As previously discussed, the ALJ properly evaluated Wright's subjective symptoms.   Wright testified that the primary reason she was unable to work was due to "stress," rather than any physical impairments.   (Tr. 506.)   Wright failed, however, to seek regular treatment for any of her impairments.   She was able to engage in significant daily activities despite her allegations of disabling impairments.   Moreover, the ALJ ordered multiple consultative mental and physical examinations.   She provided an extensive summary of the medical evidence and properly evaluated the medical opinion evidence.   The ALJ's determination that Wright could have no direct interaction with the public, only casual and infrequent interaction with co-workers, and only occasional interaction with supervisors is supported by the opinions of Drs. Armour and Levine that Wright has moderate limitations in

interacting with others.   Wright has failed to demonstrate that the ALJ's decision was outside the available "zone of choice."

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.


/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of October, 2022.